IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Judge R. Brooke Jackson

Civil Action No 14-cv-00990-RBJ

RHONDA NESBITT, individually, and on behalf of all others similarly situated,

    Plaintiff,

v.

FCNH, INC.,
VIRGINIA MASSAGE THERAPY, INC.,
MID-ATLANTIC MASSAGE THERAPY, INC.,
STEINER EDUCATION GROUP, INC.,
STEINER LEISURE LTD.,
SEG CORT LLC, d/b/a as the "Steiner Education Group",

    Defendants.

---

ORDER

---

    This matter is before the Court on two motions filed by defendants: (1) defendants' Motion for Summary Judgment, ECF No. 62; and (2) defendants' Motion to Dismiss the Claims of Opt-In Plaintiffs Soliz, Alfisi, Sprague and Williams and to Exclude Evidence from Certain Other Opt-In Plaintiffs, ECF No. 64, which remains pending after being granted in part on November 1, 2016. This Order solely addresses defendants' motion for summary judgment. For the reasons below, the Court GRANTS IN PART and DENIES IN PART that motion. In addition, because the Court dismisses plaintiffs' FLSA claim, the Court orders the parties to show cause within 14 day as to why the Court should not dismiss without prejudice the remainder of the action for lack of subject matter jurisdiction.[1]

---

[1] Plaintiffs' Second Claim sought a declaration that certain terms of an arbitration agreement that students were required to sign violated the National Labor Relations Act, 29 U.S.C. §§ 159, *et seq*. Amended

# I. FACTS

Plaintiffs are massage therapy students who attended defendants' massage therapy vocational schools.[2] ECF No. 46-1 at ¶¶5–21 (Amended Complaint); ECF No. 62 at 1 n.1. These schools are collectively run by defendant Steiner Education Group ("SEG") in the following states: Arizona, Colorado, Connecticut, Florida, Maryland, Massachusetts, Illinois, Nevada, New Jersey, Pennsylvania, Texas, Utah, Virginia, and Washington. *Id.* at ¶¶13–15. Although they enrolled as students at SEG's institutions, plaintiffs argue here that during SEG's clinical massage curriculum they functioned as defendants' "employees" under the Fair Labor Standards Act ("FLSA"), 29 U.S.C. § 201, *et seq.*, as well as their respective state's laws. *See id.* at ¶¶57–81. Accordingly, they assert claims for unpaid wages under those laws for the time they performed clinical massages for paying customers at defendants' institutions. *Id.*

<u>Enrollment at the SEG's Institutions.</u>

Upon enrolling at an SEG massage therapy vocational school, students are required to sign an "Enrollment Agreement" wherein they acknowledge that they will pay tuition in exchange for classroom and clinical training in massage therapy. ECF No. 62-2 at ¶¶12–15 (Decl. of Melissa Wage). This Agreement likewise discloses to students that it is illegal under the respective state's laws to perform massage therapy for compensation without a license, and that students are not guaranteed employment with their school or otherwise upon graduation from the program. *Id.* Students also receive a Student Catalog and Handbook upon enrolling at

---

Complaint, ECF No. 46, at ¶¶58–63. That claim could have supported federal question jurisdiction. However, the claim became moot upon denial of defendants' motion to compel arbitration, ECF No. 24, and the Tenth Circuit affirmance of that order. *Nesbitt v. FCNH, Inc.*, 811 F.3d 371 (10th Cir. 2016).

[2] Plaintiffs include named plaintiff Rhonda Nesbitt, a resident of Colorado, see ECF No. 46-1 at ¶5 (Amended Complaint), and nineteen other individuals who have filed opt-in notices. ECF No. 62 at 1 n.1. The Court, however, dismissed plaintiffs Jessica Soliz, Vanessa Alfisi, and Gina Sprague on November 1, 2016. ECF No. 89. At the time of writing this Order, the Court is waiting to hear back whether plaintiff Margaret Williams will be dropped from the case. *See* ECF No. 90.

one of defendants' schools. *Id.* at ¶¶12–17. Though these documents differ to some degree at defendants' different institutions, they all generally describe SEG's clinical requirement to graduate. *See id.* They also inform students that as unlicensed student massage therapists, they could not and would not receive compensation during this clinical component of their education. *Id.*

For the first few weeks after they enroll at one of SEG's schools, which are all accredited and licensed by the states in which they operate, see *id.* at ¶¶3–10, students engage exclusively in classroom education and practice, see ECF No. 62-8 at ¶4 (Decl. of Matthew Rodgers).[3] During that time, students learn about the practice of massage therapy. *See id.* They also have the opportunity to occasionally practice the massage therapy skills they learn in the classroom on other students and instructors. *Id.* Once they complete their school's requisite initial amount of classroom education, students can then begin SEG's clinical curriculum. *Id.* at ¶5. While they complete this clinical curriculum, students continue to receive classroom education. *See id.*

### SEG's Clinical Training Program.

Prior to giving their first clinical massages, students must undergo orientation for SEG's clinical program. *Id.* at ¶7. Though plaintiffs dispute the extent of this orientation, see ECF No. 71-2 at 56:9–14 (Dep. of Sara Alexandra Tan, August 3, 2016), defendants describe it as consisting of a discussion with students about the clinical course's objectives and the expectations of student massage therapists, ECF No. 62-8 at ¶7. As defendants explain, these "expectations include that students will greet a client" receiving a massage, "perform a 50-minute massage, and return the client to the waiting room, all within approximately one hour" in

---

[3] Though plaintiffs do not appear to have any evidence to refute that defendants' institutions are uniformly accredited and licensed, they nonetheless contend that the facts herein described suggest that defendants should have their accreditation and licenses revoked. ECF No. 71 at 19 (stating that SEG violates laws regarding the requisite amount of supervision during clinical massage programs).

order "to mimic the general timing of a massage at a spa or other professional massage therapy business." *Id.* at ¶8. During orientation instructors also explain to students that they are expected to maintain their booths and tables as if they were professional massage therapists. *Id.* at ¶17. Students therefore must apparently "move desks, tables, etc., and set up privacy curtains" during their scheduled massage clinic. ECF No. 71 at 5.

In general, students perform roughly 100 massages (lasting approximately 50 minutes each) during SEG's clinical program. ECF No. 62-8 at ¶12. They perform these massages at their respective schools in cordoned off, empty classrooms. *See* ECF No. 71-16 at 34:3–11 (Dep. of Matthew Rodgers, July 26, 2016). Their clients are paying customers from the public to whom defendants' institutions publicly advertise discounted massages at their respective schools.[4] ECF No. 62-8 at ¶2; ECF No. 71-18 (Advertisements). Because customers pay some amount of money to receive their clinical massages, defendants generate revenue from SEG's clinical curriculum. *See* ECF No. 62-14 at ¶¶3–6 (Decl. of James Wharton). It is disputed, however, whether these schools actually profit from running these clinics. *Compare id.* at ¶8 *with* ECF No. 71 at 6–7. Regardless of whether students' massages generate profit, the Enrollment Agreement, Student Catalog and Handbook inform students that they will not receive compensation for providing massage services during their clinical training. ECF No. 62-2 at ¶¶12–17. Defendants contend that it would be illegal under the laws in every state in which they operate to pay students as unlicensed massage therapists for performing these massages. ECF No. 62 at 3 (citing C.R.S. § 12-35.5-107; 3 C.C.R. § 722-1:2).

---

[4] Plaintiffs likewise contend that defendants' advertising campaigns mislead the public because they do not explain that these discounted massages will be performed by students, although the advertisements state that massages will take place at massage therapy vocational schools. ECF No. 71 at 18; ECF No. 71-18.

In any event, because this training is a "clinical" massage program, after each massage the student's client has the opportunity to provide the student with feedback. *See* ECF No. 62-8 at ¶15. How often feedback is given is disputed. *See* ECF No. 71-4 at 21:23–35, 22:1–5 (Dep. of Amanda Camacho, July 14, 2016). Nevertheless, if a customer provides a student massage therapist with feedback, the student and his or her instructors discuss those comments and criticisms during classroom instruction later in the week. ECF No. 62-8 at ¶18. Furthermore, although it is once again disputed how much this occurs, students also are apparently required to perform a certain number of massages on their instructors or licensed massage therapists during these clinics in order to receive additional feedback from a source "more knowledgeable than the general public" about massage therapy. ECF No. 62-8 at ¶16.

Finally, one last disputed issue about defendants' clinics that is relevant in this case is how much SEG supervises its programs. Defendants contend that they comply with all state regulations pertaining to this issue, as they are required to do in order to become accredited, and that students performing massages at all defendants' institutions are "supervised by a clinic manager and teaching assistants, who are there to facilitate the clinic process, provide feedback to the students, and are available to answer any student questions that may arise." ECF No. 62-8 at 10. This "clinic manager is a licensed and experienced massage therapists, as generally are the teaching assistants." *Id.* For their part, plaintiffs counter that these supervisors did not provide direct or individualized supervision during the clinics. *See, e.g.*, ECF No. 71-2 at 40:3–13.

## Procedural History

Plaintiff Rhonda Nesbitt initiated this suit against SEG and various additional defendants on April 7, 2014. ECF No. 1 (Complaint). She sues individually but also purportedly on behalf of all those similarly situated. *Id.* She seeks certification of a class or collective action on behalf

5

of all those whom attended SEG's schools in fourteen states within the past three years. *See generally id.* Plaintiffs' Complaint included five claims for relief, including a claim under the FLSA, a claim to declare unlawful certain terms of the parties' Arbitration Agreement, and claims for wages under several state statutes. *Id.* at ¶¶57–81. After failing to compel arbitration, defendants moved for judgment on the pleadings on March 7, 2016. ECF No. 44. The Court, however, denied that motion as moot at a March 10, 2016 status conference during which it granted plaintiffs' oral motion to amend the Complaint. ECF No. 45. Plaintiffs then filed their Amended Complaint on April 28, 2016. ECF No. 46-1.

On August 19, 2016 defendants filed two more motions: (1) a motion for summary judgment, ECF No. 62; and (2) a motion to dismiss several plaintiffs who had opted-in and to exclude evidence from other opt-in plaintiffs, ECF No. 64. The Court held oral arguments on defendants' motion for summary judgment on November 1, 2016, during which time it granted in part defendants' motion to dismiss several opt-in plaintiffs. ECF No. 89. Defendants' pending motion for summary judgment is the subject of this Order.

## II. STANDARD OF REVIEW

The Court may grant summary judgment if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving party has the burden to show that there is an absence of evidence to support the nonmoving party's case. *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986). The nonmoving party must "designate specific facts showing that there is a genuine issue for trial." *Id.* at 324. A fact is material "if under the substantive law it is essential to the proper disposition of the claim." *Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 670 (10th Cir. 1998) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). A material fact is genuine if "the evidence is such that a

reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248. The Court will examine the factual record and make reasonable inferences therefrom in the light most favorable to the party opposing summary judgment. *Concrete Works of Colo., Inc. v. City & Cnty. of Denver*, 36 F.3d 1513, 1517 (10th Cir. 1994).

### III. ANALYSIS

The one dispositive issue before the Court on summary judgment is whether the plaintiffs qualified as "employees" under the FLSA during defendants' clinical programs. This is a question of law to be decided by a "totality of the circumstances" approach that looks at six factors to assess the economic realities of the parties' relationship. *See Reich v. Parker Fire Protection Dist.*, 992 F.2d 1023, 1025–26 (10th Cir. 1993). Using that test here, I find that, although there are various disputes of fact as noted above, the disputed facts are not material to the decision. I conclude as a matter of law that these plaintiffs do not qualify as "employees" under the FLSA. The Court therefore grants defendants' motion for summary judgment as it pertains to the FLSA claim and enters judgment dismissing it. However, because I find that the parties do not adequately brief plaintiffs' state law claims, I decline to grant defendants' motion as to those claims. I address both issues, as well as my *sua sponte* decision to question subject matter jurisdiction in light of these decisions, in turn.

#### A. FLSA: The Tenth Circuit's Six-Factor "Totality of the Circumstances" Test.

In *Reich*, the Tenth Circuit confronted the issue of whether four firefighter trainees were entitled to minimum wages under the FLSA while in training at a firefighting academy. *Id.* at 1024–25. Recognizing that "[t]he FLSA itself provide[d] little guidance in distinguishing between trainees and employees," the court turned to how the Supreme Court and the Department of Labor historically have defined the scope of the FLSA. *Id.* at 1025–27.

7

The court acknowledged that the Department, based on prior Supreme Court precedent, had "developed a test listing six criteria for determining whether trainees are employees within the meaning of the FLSA." *Id.* at 1025–26 (citing *Walling v. Portland Terminal Co.*, 330 U.S. 148 (1947)). The six factors are: (1) "The training, even though it includes actual operation of the facilities of the employer, is similar to that which would be given in a vocational school;" (2) "The training is for the benefit of the trainee;" (3) "The trainees do not displace regular employees, but work under close supervision;" (4) "The employer that provides the training derives no immediate advantage from the activities of the trainees and on occasion his operations may actually be impeded;" (5) "The trainees are not necessarily entitled to a job at the completion of the training period;" and (6) "The employer and the trainees understand that the trainees are not entitled to wages for the time spent in training." *Id.* at 1026 (citing Wage & Hour Manual (BNA) 91:416 (1975)).

As the court explained, the Department originally decided that these six criteria should be used in a "totality of the circumstances" assessment of whether a plaintiff was an "employee" of the defendant. *See id.* at 1027. Nevertheless, as the Department issued additional Wage and Hour Administrator opinions after its initial decision, it morphed that test into an "all or nothing standard." *Id.* at 1026–27. By the Department's new interpretation, which the Department asked the Tenth Circuit to adopt in *Reich*, unless *all* six criteria were established, a plaintiff was an "employee" under the FLSA and was subsequently entitled to minimum wages and possibly other compensation as well. *Id.* at 1026.

Finding that this stricter approach clashed with how the Department and Supreme Court originally conceived the six-factor analysis, the Tenth Circuit explicitly refused to give deference to the Department's new approach. *Id.* Instead, the court explained that the earlier "totality of

8

the circumstances" framework was the proper way to determine the existence of an employment relationship under the FLSA. *Id.* at 1027; *see Ortega v. Denver Institute*, LLC, No. 14-cv-1351-MEH, 2015 WL 4576976, at *17 (D. Colo. July 30, 2015) (applying the six factors and the totality of the circumstances approach in determining whether cosmetology students were employees for purposes of the FLSA). Accordingly, although plaintiffs ask this Court to look to other jurisdictions' tests to decide the question of whether plaintiffs were defendants' employees under the FLSA, see, e.g., ECF No. 71 at 19 (citing *Guy v. Casal Inst. of Nevada, LLC*, No. 2:13-cv-02263-RFB-GWF, 2016 WL 4479537, at *3 (D. Nev. Aug. 23, 2016)), the "totality of the circumstances" test, as described by the Tenth Circuit in *Reich*, is the test I am bound to apply here.[5]

### B. Six-Factor Analysis.

Applying the test from *Reich*, I find that the economic realities of the plaintiffs' relationship establish that plaintiffs were not defendants' employees during the time they performed clinical massages at defendants' institutions. I address each of the six factors from *Reich* in turn.

### 1. Factor One: Was the Training Received Similar to the Training at Vocational Schools?

Defendants argue that the first factor weighs against a finding that plaintiffs were employees because all of SEG's institutions are vocational schools, making their clinical training programs literally "vocational school" training. *See* ECF No. 62 at 13. Plaintiffs counter that due to the lack of supervision at defendants' clinics, defendants operated as vocational schools in name only. *See* ECF No. 71 at 14–15. Defendants have the better argument.

---

[5] While I refuse to analyze whether plaintiffs are employees under the FLSA using a framework from a different circuit in light of the Tenth Circuit's decision in *Reich*, I nonetheless find persuasive how other courts have analyzed any or all of the factors *Reich* discusses. Therefore, this Order occasionally cites to decisions outside the Tenth Circuit in its analysis of the issue.

On its face, this factor requires no analysis beyond a finding that the institutions are in fact vocational schools, which plaintiffs admit. ECF No. 79 at 2. This was Magistrate Judge Hegarty's interpretation, and I agree. *Ortega*, 2015 WL 4576976 at *14 (finding the first factor weighed against a finding that cosmetology students were employees of their vocational school because it was "undisputed that [Aveda Institute Denver] is, in fact, a vocational school"); *see also Portland Terminal Co.*, 330 U.S. at 152–53 ("Had these trainees taken courses . . . in a public or private vocational school . . . it could not reasonably be suggested that they were employees of the school within the meaning of the [FSLA]."); *Reich*, 922 F.3d at 1028 (explaining that a training program is "comparable to vocational school if the program teaches skills that are fungible within the industry"). Moreover, the third factor analyzed in *Reich*, discussed *infra*, is the factor that specifically deals with the supervision a potential employer provides. *See Reich*, 992 F.2d at 1028 (analyzing the level of supervision at the firefighting academy as part of factor three and concluding that due to the level of supervision, trainees "did not obviate the need for qualified firefighters").

**2. Factor Two: Is the Training for the Benefit of the Student?**

Defendants argue that the training benefits the students because it enables them to practice the skills that they learned in the classroom; it teaches client-service skills they will need as practicing massage therapists; and in any event, it is a statutory prerequisite to obtaining massage therapy licenses. ECF No. 62 at 14; ECF No. 79 at 6–8. Plaintiffs counter with a similar argument to the one they made above—namely, that because there was little to no supervision during the clinics, the clinics provided students with little if any tangible value. ECF No. 71 at 16. Once again, I find defendants' arguments are more convincing.

Setting aside the practical benefits, clinical experience is required in order to graduate from an accredited school and become a licensed practitioner in the states in which these plaintiffs enrolled. Therefore, the clinics had an obvious benefit for them. *Accord Ortega*, 2015 WL 4576976 at *14 (finding the second factor cuts against an employment relationship where "[t]he record establishe[d] that . . . [plaintiff] could not have become licensed in Colorado without completing the requirements through a school such as AID"). Moreover, realistically, it is hard to quarrel with the notion that practice makes perfect or, at least, practice makes one better. *See Reich*, 992 F.2d at 1028 (noting that "[t]here is no question but that, in acquiring skills transferable within the industry" the fire fighter trainee plaintiffs "benefitted from their training").

Indeed, plaintiffs themselves admit that they derived benefit from the opportunity to perform massages on real-live customers. *See* ECF No. 1 (Complaint) (acknowledging that "the class members' labor in [defendants'] personal services business benefits them in securing experience providing such personal services and in achieving their ultimate goal of being licensed to practice their desired occupation"); ECF No. 46-1 (Amended Complaint) (recognizing that plaintiffs "receiv[ed] a benefit from their labor in [defendants'] personal services business in the form of experience that assisted them in achieving their occupational goals"). I find that the second factor similarly cuts against a finding that defendants employed plaintiffs.

### 3. Factor Three: Do Students Displace Regular Employees or Work Under Close Supervision?

On the third factor, defendants first note that it is undisputed that defendants "do not employ licensed massage therapists to perform massages on the public." *See* ECF No. 62 at 15. It follows that plaintiffs did not displace other "regular employees" of defendants' institutions.

11

*See id*. Second, they point out that it is also undisputed that defendants met state licensing and accrediting standards, which often mandated a basic level of supervision. *Id.* at 15–16. They argue from these undisputed facts that the level of supervision defendants provided to plaintiffs during their clinical training maintained plaintiffs' status as students. *Id*.

Plaintiffs counter with two arguments of their own. They contend that they displaced regular workers because defendants used plaintiffs as an unpaid workforce to generate revenue to further their for-profit business. ECF No. 71 at 17–18. Thus, while defendants did not have regular paid employees, plaintiffs argue that defendants effectively obviated the need for such a workforce. *Id.* Second, they contend that the evidence shows that defendants did not provide any "actual" supervision during clinics. *See id.* at 18.

At the outset, I note that it is unclear whether the third factor solely addresses whether students displace a potential employer's *existing* workforce, or whether it is also relevant, as plaintiffs argue, whether students' roles within a business or institution may deceitfully be crafted to obviate the need for hiring regular employees. *See Hollins v. Regency Corp*., 144 F. Supp. 3d 990, 1002–04 (N.D. Ill. 2015) (grappling with this issue). If the former is true, which is how the Supreme Court decided the issue in *Portland Terminal* based on the facts presented in that case, see 330 U.S. at 149–50, this factor undoubtedly weighs in defendant's favor. After all, it is undisputed that defendants, as vocational schools, do not employ licensed massage therapists to perform paid massages. *See* ECF No. 79 at 8–9; *see also Ortega*, 2015 WL 4576976 at *15 ("It is undisputed that there are no employees performing cosmetology services at [Aveda Institute Denver ("AID")] who are not educators of the students. The school is not a commercial retail salon, so AID does not employ non-teaching cosmetologists."); *Hollins*, 144 F. Supp. 3d at 1003 ("Similarly here, as a vocational institution that trains future cosmetologists, Regency is not

12

in the business of hiring licensed cosmetologists to work on the performance floor. The performance floor exists only because it is needed to train students . . . [thus] no displacement of labor is occurring.").

But assuming that plaintiffs' theory is viable, I still find that the level of supervision defendants supplied during their clinics weighs against a finding of an employment relationship. It is undisputed that defendants met all state accrediting and licensing requirements in every state in which they operate massage therapy schools. ECF No. 62-2 at ¶¶3–8. They therefore provide at their clinics the level of supervision that each state required if it specifically mandated a level of supervision during clinical training. *See id.* For instance, in the case of defendants' schools in Colorado, that meant that defendants provided "immediate supervision" to students during clinical work. [6] C.R.S.A. § 12-35.5-110(1)(a). Given that this was the level of supervision that Colorado determined turned the otherwise unlawful practice of massage therapy into approved clinical work by *student* massage therapists, see *id.*, I find the undisputed facts of defendants' accreditation and licensing tip the third factor in their favor.

While plaintiffs point out that only nine of fourteen states specified in some manner the level of supervision required to be accredited or licensed, see ECF No. 71-1, the undisputed facts nevertheless show that defendants' clinics across the country all functioned in largely the same way. *See* ECF No. 62-8 at ¶10. That is, defendants provided students with some form of orientation before the clinic, had a supervising massage therapist on the premises whom was available for immediate consultation or assistance, and discussed any feedback students received later on in ongoing classroom instruction. *See id.* Therefore, I conclude that the level of

---

[6] Colorado further defines "immediate supervision" to mean that a "supervising massage therapist (a) is present on the premises where the services are being performed; and (b) is available for immediate consultation and to assist the person being supervised in the services being performed." 3 C.C.R. § 722-1:6.

13

supervision defendants provided, regardless of what state law mandated, does not suggest an employee-employer relationship between the parties.

Plaintiffs' central argument, which they repeat from factor to factor, is that in reality the defendants do not provide much if any supervision at their clinics, adding their opinion that defendants did not provide the level of supervision at their clinics "that the law requires[.]"[7] *Id.* at 17. I find these largely to be conclusions in search of facts. It is a fact, and is not disputable, that defendants have been determined to have continually met every applicable accreditation and state licensing standard. *See* ECF No. 79 at 3. Furthermore, the evidence plaintiffs' rely on to make such an argument actually contradicts their characterization of events. *See, e.g.*, ECF No. 71-15 at ¶10 (Decl. of Rhonda Nesbitt) ("There were people—including *staff*, students, and the public—walking by the massage areas *all the time when the clinic was going on*.") (Emphasis added).

Essentially, plaintiffs' arguments about the level of supervision at defendants' clinics are based largely on plaintiffs' subjective beliefs about the level of supervision they thought defendants *should* have provided. *See, e.g.*, ECF No. 79-4 at 37:13–20 (Dep. of Stephanie Landaverde, July 14, 2016) ("Q . . . Is it accurate to say that the clinic manager or another instructor was present at the clinic at all times when you were doing clinical massages? A. I would say that they were present, but they were not present with me when I was doing massages.").

I accept that one can dispute whether defendants' schools provided "close" supervision to all students at all times. To the extent that the supervision provided fell short of "close"

___

[7] In making this claim that defendants are operating illegally, plaintiffs essentially argue that defendants should have their accreditation and licenses revoked. *See* ECF No. 71 at 18. To the extent that is what plaintiffs want, they may be barking up the wrong tree. *See, e.g.*, C.R.S.A. § 12-35.5-112 (explaining the state regulatory process for invalidating a massage therapy school's license in Colorado).

14

supervision, I go back to the *Reich* court's holding that the analysis must be based on the totality of the circumstances, not necessarily strict compliance with each of the six factors. But it simply is not true that no supervision was provided during the clinical portion of the curriculum. Overall, I am not persuaded that the third factor weighs heavily in favor of a finding that an employment relationship existed. *See Jochim v. Jean Madeline Educ. Ctr. of Cosmetology, Inc.*, 98 F. Supp. 3d 750, 758 (E.D. Pa. 2015) ("[Plaintiff's] feeling that she was under-supervised, or that her instructors were busy . . . does not create an employment relationship."); *Ortega*, 2015 WL 4576976, at *13 (noting that *Jochim* "represent[s] good law"). At most the third factor can be said to cut both ways.

### 4. Factor Four: Does the Employer Derive an Immediate Advantage from the Students' Activities or are its Operations Occasionally Impeded?

On the fourth factor, defendants contend that they do not derive an immediate advantage from the clinical massages plaintiffs perform because they do not make a profit from these discounted services. ECF No. 62 at 16–17. In the alternative, defendants argue that even if their clinics did earn them a profit that this factor alone is insufficient to convert students to employees when no other factors cut the same way. *Id.* Plaintiffs counter that defendants do not allocate their costs correctly, and that the issue of whether defendants derive a benefit is therefore a disputed issue of fact. ECF No. 71 at 18–19. I agree with both parties.

I agree with plaintiffs that the issue of whether or not defendants made some level of profit on their clinics is genuinely disputed. *See id.* Oddly, the plaintiffs at times seem to admit that this factual dispute is not material to the issue of whether plaintiffs were employees. ECF No. 71 at 17 (stating that "[w]hether Steiner made a profit by operating the clinic is not relevant to the economic realities test"). In any event, I agree with Judge Hegarty's and others' analysis of this factor. *Ortega*, 2015 WL 4576976 at *16 ("The Court also notes that even if the school

15

had made millions, including from tuition and the salon as Plaintiff asserts, it would still be insufficient under the facts at hand to defeat summary judgment based on the totality of the circumstances that indicate Plaintiff was a student and not an employee."); *Jochim*, 98 F.Supp.3d at 759 ("Even assuming . . . [defendant's] clinic is profitable, that factor alone does not suffice to transform the economic reality of the relationship . . . into one qualifying as employee/employer under the FLSA."); *Atkins v. Capri Training Ctr., Inc.*, No. 2:13-CV-06820-SDW, 2014 WL 4930906, at *6 (D.N.J. Oct. 1, 2014), *appeal dismissed* (Feb. 6, 2015) ("There is no genuine issue of material fact in dispute to preclude summary judgment. As will be discussed below, even if Defendants did receive some profit, Plaintiff has not met the necessary factors under the economic reality test or shown that the primary benefit of the relationship was to Defendants.").

> 5. **Factor Five: Are Students Entitled to a Job Upon Completion of their Training?**

Regarding the fifth factor, it is undisputed that plaintiffs were not entitled to a job upon completion of their training, and that all plaintiffs understood that this was the case. *See* ECF No. 71 at 19 ("Plaintiffs admit that they understood they were not entitled to a job at the completion of their education[.]"). Therefore, I find that the fifth factor also weighs in defendants' favor and against a finding of an employment relationship.

> 6. **Factor Six: Do the Students and Employer Understand that the Students are not Entitled to Wages for the Time Spent Training?**

It is also undisputed that plaintiffs and defendants understood that plaintiffs would not be entitled to the wages for the time they performed clinical training. *See id.* ("Plaintiffs admit . . . that they would not be entitled to wages for the time spent in training."). Accordingly, I find that the sixth factor weighs against a finding that plaintiffs were defendants' employees.

16

### C. Conclusion.

I have found that at least four and arguably more of the six *Reich* factors suggest that plaintiffs were not defendants' employees. But at bottom I look at the "totality of the circumstances" and of the "entirety of the economic realities" of the parties' relationship. Put another way, I look at the forest, not just the trees. Plaintiffs went to school to learn a skill and to qualify for a license to practice that skill professionally. They needed and presumably wanted clinical experience in order to accomplish these goals. They did not expect to be paid. For whatever reason some of the graduates now wish to turn the clock back and claim entitlement to payment for their clinical education. I find and conclude that they have no case under the Fair Labor Standards Act.

### D. Plaintiffs' State Law Claims.

While I find summary judgment appropriate on plaintiffs' FLSA claim, I am not convinced that the parties have adequately briefed the issue of whether a grant of summary judgment on plaintiffs' FLSA claim also disposes of plaintiffs' state law claims. *See* ECF No. 62 at 2 n.2 (arguing without citing any case law that "[w]hile different states apply different tests to determine who should be classified as an employee, the same threshold issue . . . exists, and Defendants respectfully submit that regardless of the test applied, Plaintiffs simply cannot come forward with facts to create a genuine issue of material fact regarding the existence of an employment relationship"); *see also Ortega*, 2015 WL 4576976, at \*17 (granting summary judgment on the plaintiff's FLSA claim and then on her claim under Colorado law after analyzing the parties' arguments on how Colorado defines an "employee[] for purposes of Colorado's wage and hour laws"). Accordingly, I deny defendants' motion as it pertains to those claims.

### E. Subject Matter Jurisdiction.

Finally, the Court *sua sponte* raises the question whether it continues to have subject matter jurisdiction in this case. Plaintiffs based jurisdiction on federal question jurisdiction and the Class Action Fairness Act, 28 U.S.C. § 1332(d), see ECF No. 46-1 at ¶¶1–4, but the Court has now dismissed all federal claims. Thus, only plaintiffs' state law claims remain, each of which might require unique analysis of perhaps differing state employment and wage laws. Accordingly, the Court orders the parties to show cause within 14 days as to why it should not dismiss without prejudice the remainder of plaintiffs' action for lack of subject matter jurisdiction.

## ORDER

For the reasons above, defendants' motion for summary judgment [ECF No. 62] is GRANTED IN PART and DENIED IN PART.

DATED this 14th day of November, 2016.

BY THE COURT:

_____
R. Brooke Jackson
United States District Judge